# EXHIBIT A

EFiled: Jan 14 2025 03:05PM EST
Transaction ID 75434606
Case No. N24C-01-070 VLM

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

ANGELA DRAGHICESCU,                )
                                   )
                    Plaintiff,     )
                                   )
        v.                         )        C.A. No. N24C-01-070-VLM
                                   )
UNIVERSITY OF DELAWARE,            )
                                   )
                    Defendant.     )

## FIRST AMENDED COMPLAINT

Plaintiff Angela Draghicescu ("Plaintiff"), by and through her undersigned counsel, based upon personal knowledge and upon information and belief as to all other matters, alleges as follows:

## PARTIES

1.    Plaintiff is an adult-individual and resident of Pennsylvania who may be contacted through her undersigned counsel.

2.    Defendant University of Delaware ("Defendant") is a public university organized in and pursuant to the laws of the State of Delaware.

## JURISDICTION

3.    This Court has jurisdiction over the dispute due to Plaintiff working for Defendant within Delaware and Defendant operating its university within Delaware.

4.    On October 3, 2024, the Equal Employment Opportunity Commission issued a Right to Sue notice to Plaintiff. **Exhibit F.**

5.      On October 18, 2024, the Delaware Department of Labor issued a Right to Sue notice to Plaintiff.  **Exhibit G.**

## FACTS

6.      Plaintiff commenced employment with Defendant in the Spring 2020, working within Defendant's School of Music.

7.      At all relevant times, Plaintiff was a W-2 employee of Defendant.

8.      In 2023, Plaintiff was one of three collaborative pianists with the School of Music, working alongside Mark Livshits, and Sira Jittapirom.

9.      On June 30, 2023, Lawrence Stomberg, then-Associate Chair of Performance Studies (part of the School of Music administration), offered Plaintiff an increased salary of $50,000 with a corresponding increase in workload, as is evidenced in the email thread attached hereto as **Exhibit A**.

10.     On July 29, 2023, Mr. Stomberg wrote to Plaintiff, confirming that her increase in salary to an even $50,000 for the entire academic year was approved. *See* **Exhibit A**.  Mr. Stomberg additionally indicated he was waiting on data to ensure workload was equitably distributed among School of Music faculty. *See* **Exhibit A**.

11.     Plaintiff responded to Mr. Stomberg on July 29, 2023, thanking him, and specifically mentioning the scheduling and frequency of juries. Plaintiff was concerned with the health of her hands (she is and was a pianist at all relevant times),

2

as well as the hands of her colleagues, through "over playing" instruments during a condensed period of time. *See* **Exhibit A**. Plaintiff was not indicating she could not handle the workload contemplated for her $50,000-salaried position.

12.     In or around August 2023 when Plaintiff attempted to ask Mr. Stromberg a question about transparency within the Department, he told her to "stop being confrontational."  This was following an earlier encounter with Mr. Stromberg in which he called Plaintiff "hormonal."

13.     On August 10, 2023, Plaintiff requested a "Title 9 meeting" with the Office of Equity and Inclusion to discuss her situation.  On August 11, 2023, Plaintiff met with Tiffany Chen concerning Mr. Stomberg's treatment of her. Plaintiff also shared with Ms. Chen the comments Mr. Stomberg had made to her about being "confrontational" and "hormonal."

14.     On or about August 15, 2023, Plaintiff met with Susanne Laliberte of Employee Relations concerning the same issues.  Later that day, Plaintiff asked to hold off on filing a complaint with Employee Relations because she had learned "new information related to [her] supervisor," and wanted to sort it out first. Plaintiff had hoped she could reach a resolution internally, without moving forward with a formal complaint.

15.     Plaintiff and Mr. Stomberg met on or about August 19, 2023 to continue discussing the distribution of work for the School of Music. An email thread

3

beginning August 20, 2023 contextualizes their discussions, which is attached hereto as **Exhibit B**. As can be seen therein, Mr. Stomberg purports to accommodate Plaintiff's needs regarding the health of her hands. Mr. Stomberg also purports to have made assignments for the instrumental area duties to be equally split between Plaintiff and Mr. Livshits, but in a meeting in which these assignments were discussed, only one studio was swapped and the issue of the imbalance in workload toward the end of the semester was not remedied.

16.     After assignments were finalized, on August 28, 2023 – the day before the start of the Fall semester – Mr. Stomberg attempted to add vocal classes to Plaintiff's workload. Plaintiff did not refuse this addition to her assignments but raised concerns with the increase in workload on the potential for injury and the fact that she had scheduling conflicts.

17.     Their conversation continued through the end of August 2023. Plaintiff and Defendant came to an enforceable agreement regarding Plaintiff's pay, assignments, and responsibilities through the correspondence and communications described herein. Classes for the Fall 2023 semester commenced on August 29, 2023. Plaintiff began work on or about that day (in addition to substantial preparation she had undergone before that date).

18.     On August 30, 2023, Plaintiff emailed Mr. Stomberg again regarding scheduling and the distribution of work, a copy of which is attached hereto as

**Exhibit C**. She explicitly referenced pacing and balancing her workload in order to protect the health of her hands. Plaintiff was concerned that Mr. Stomberg was mandating that she work even more than what was agreed upon in the preceding weeks (*i.e.*, asking Plaintiff to assist with additional assignments for the vocal studio).

19.    On September 1, 2023, Mark Clodfelter, the then-Director of the School of Music, after consultation with Stomberg, abruptly breached UD's agreement to pay Plaintiff a $50,000 salary through an email, attached hereto as **Exhibit D**.

20.    Mr. Clodfelter informed Plaintiff that her salary would be reduced to $32,000 for the 2023-2024 academic year with the opportunity to work additional hours to be paid hourly, *if offered*, which she would be required to report on a timesheet reporting system. He reduced her hours to an average of 16 hours per week, despite her assignments remaining the same, making it impossible to complete all her assigned work in 16 hours per week. Mr. Clodfelder explicitly mentioned he made this decision to purportedly "protect[] [Plaintiff's] hands, health, and well-being." **Exhibit D**. Thus, Plaintiff was penalized for requesting reasonable accommodations for her health and safety, which Defendant interpreted and regarded as a disability.

21.    Throughout the duration of the 2023-2024 academic year, Defendant required Plaintiff to work significantly more than 16 hours per week. On average, Plaintiff worked approximately 31 hours per week, not including the 5.14 hours per week required by the music course that she taught in both the spring and fall semesters (course MUSC 241).

22.    Over the next several months, Plaintiff protested Mr. Clodfelter's reneging through various channels.

23.    On or about September 5, 2023, Plaintiff submitted a Complaint form to Employee Relations (the "September 5 Complaint"), complaining about, among other things: her reduction in pay while simultaneously being asked to perform the same workload under a reduced hours schedule; the fact that she had voiced concerns for injury prevention and was met with a pay reduction instead; and the fact that she was assigned a disproportionate amount of hours relative to duties, as compared to Mr. Livshits.

24.    On September 6, 2023, Plaintiff further protested Mr. Clodfelter's breach of contract by sending a letter to Mr. Clodfelter through her former counsel, which is attached hereto as **Exhibit E**. In this letter, Plaintiff rejected Mr. Clodfelter's reneging of UD's promise to pay her a $50,000 and opposed the retaliatory treatment Plaintiff received on account of her request for a reasonable accommodation.

25.    Plaintiff's September 5 Complaint to Employee Relations about her concerns was met with delay and hostility.  On September 11, 2023, Ms. Laliberte cancelled a scheduled meeting between her and Plaintiff to discuss her Complaint on the grounds that Plaintiff had "filed an additional complaint." Plaintiff responded that she was not aware of filing another complaint and asked for the meeting to go forward as scheduled. Ms. Laliberte responded that she was sorry she could not offer any further details, but that she was directed to wait on Plaintiff's complaint until the "other matter" had been resolved.

26.    Ms. Laliberte did not contact Plaintiff again until over a month later, on October 25, 2023. In that meeting, Ms. Laliberte aggressively accused Plaintiff of not being an adjunct faculty member and told Plaintiff that she should have reached out to their department for disability accommodations. Ms. Laliberte followed this conversation up with information and links for requesting a reasonable accommodation. Clearly, Defendant viewed Plaintiff as disabled and potentially in need of accommodations, when all Plaintiff was trying to do was to rectify the unbalanced workload for the sake of injury prevention.

27.    Employee Relations eventually performed an incomplete investigation into Plaintiff's September 5 Complaint. Completely ignoring Plaintiff's concerns about her differential treatment as compared to her male colleague, Mark Livshits (among other "DEI concerns"), on November 3, 2023, Employee Relations issued

a "Closeout Discussion" memorandum that found "no evidence" to substantiate the claim relating to an employment of immediate family members policy violation claim. It made no finding as to Plaintiff's "DEI concerns," or complaint about discrimination and differential treatment as compared to her male colleague.

28.    Following this, Plaintiff retained counsel to attempt to sort out her wage dispute with the University. Employee Relations and the University's in-house counsel instead informed Plaintiff that she was an hourly employee, to be paid for the hours she worked. When Plaintiff and the University were unable to come to an agreement on the amount of wages owed to her, Plaintiff's counsel informed the University that she intended to proceed with her wage claim and that she reserved all rights regarding her discrimination claim.

29.    On January 10, 2024, Plaintiff initiated this action in this Court for violation of the Delaware Wage Payment and Collection Act, and for breach of contract. Plaintiff continued to work for Defendant in the meantime, but her working conditions and environment worsened.

30.    Despite Plaintiff's repeated efforts to advocate and protect herself, the Defendant continued to engage in a course of conduct of discrimination and retaliation based on her perceived disability and because she voiced concerns about injuring her hands as a result of UD's unreasonable workload demands and her

Mr. Stomberg's discriminatory treatment of her as compared to her male colleague, Mr. Livshits.

31.    Throughout the 2023-2024 academic year, Mr. Stomberg treated Mr. Livshits more favorably relative to Plaintiff with respect to workload distribution, opportunities for extras pay, and in promotional opportunities.

32.    For example, in the 2023-2024 school year, Mr. Livshits was paid $50,000—the compensation Claimant was also promised until UD breached its agreement and reduced her salary to $32,000. The University did not reduce Mr. Livshits's salary; yet the distribution of assignments between Plaintiff and Mr. Livshits remained the same, and Plaintiff was actually assigned more work than Mr. Livshits. In essence, the University required Plaintiff to not only perform more work than her male colleague, but also to accept lower pay than him.

33.    As further examples, at the beginning of the Fall 2023 semester, Mr. Livshits was given 100 hours for a concerto competition, which is significantly more hours than necessary to complete the duties and responsibilities associated with that assignment. Subsequently, Mr. Stomberg reversed coverage of these duties. Mr. Stomberg removed the preliminary round of this competition from Mr. Livshits' responsibilities so that he was responsible for covering the final round only, which effectively reduced this assignment by at least 75 hours.

34.     Mr. Livshits had a history of being afforded great leniency by Mr. Stomberg, who did not discipline him for failing to timely appear (or appear at all) for mandatory assignments of collaborative pianists, such as rehearsals, the concerto competition, juries, and recitals.

35.     On February 7, 2024, Plaintiff reached out to Ms. Chen with the Office of Equity and Inclusion, asking to set up a meeting to discuss and move forward with the issue she had previously raised in the Fall 2023 semester. Plaintiff followed up with Ms. Chen on February 9, 2024 but received no response.

36.     On February 11, 2024, Plaintiff met with Daniel Stevens ("Mr. Stevens"), the current interim director for the School of Music regarding Stomberg's discriminatory treatment of her in comparison with Mr. Livshits and asked that Mr. Stomberg no longer be assigned as her supervisor (the "February Report").

37.     Following this meeting, on March 12, 2024—in the middle of the Spring semester, Mr. Stevens abruptly informed Plaintiff that the MUSC 241 course that she taught as an adjunct professor would not be offered for the following academic year, ostensibly due to "budget reasons," thus depriving her of income she stood to make for teaching the MUSC 241 course in the coming semester.

38.     In addition to canceling Plaintiff's class, the University committed further acts of discrimination and retaliation by reassigning some of Plaintiff's

students to other professors, which curtailed the ability for her to earn extra hours for compensation.

39.    In addition, in the Spring 2024 Semester, Plaintiff discovered that the hourly rate used to calculate her compensation was reduced from $67 per hour to $58 per hour, representing an approximate 13% reduction in her pay rate.

40.    On April 16, 2024, Plaintiff contacted upper administration (including the Provost's office and Mr. Stevens) to report that she was experiencing continued retaliation from Mr. Stomberg and requested that he be removed as her supervisor (the "April Report"). She further reported, among other things, that Mr. Stomberg had cut her pay on the basis of a perceived disability, and that he was attempting to force her to resign by assigning her work that was not paid following her September 5 Complaint. Plaintiff also reported the 13% decrease to her pay rate that semester, unilateral changes made to her contract by UD's Employee Relations department, and the removal of the music course following her filing of the wage payment lawsuit against the University. Finally, Plaintiff complained about an "extensive pattern of discrimination."

41.    On or around April 23, 2024, as Plaintiff was walking across campus, she crossed paths with Mr. Stomberg. Plaintiff asked him how he was, and he became very uncomfortable, turned red, and said "how do you think I am doing you

disgusting kike." Plaintiff, a Jewish person, was shocked by his use of this derogatory ethnic slur toward her.

42.    Not long after this, on May 8, 2024, Plaintiff received an email from Employee Relations asking to schedule a meeting with her to discuss "some student concerns that were brought to [their] attention." Perplexed, Plaintiff agreed. If these were genuine concerns brought by students, Plaintiff understood that there was a grievance process in the handbook was available for them to bring such concerns. But, because Employee Relations was requesting this interview, Plaintiff grew concerned that the "concerns" had originated with one of her colleagues (for example, Mr. Stomberg) and was yet another measure of intended retaliation for her voicing her concerns about her mistreatment.

43.    On May 17, 2024, Plaintiff received a Close Out Memorandum from Employee Relations finding that she had allegedly acted "inappropriately and unprofessionally" in interactions with students and that she had supposedly violated "UD's Code of Ethics, The Faculty Handbook; Non-Discrimination, Sexual Misconduct and Title IX." These serious, unsupported allegations were determined by UD's Employee Relations department and were not investigated according to the proper processes and channels as afforded, for example, under UD's Title IX policies and procedures at the very least. Plaintiff was not given adequate notice of the allegations made against her, nor was she afforded any opportunity to be heard

and to defend against those allegations. In direct violation of Title IX procedures, Plaintiff was never afforded a hearing related to the Title IX allegations of sexual misconduct.

44.     On May 21, 2024, Plaintiff made a Title IX Complaint, reporting Mr. Stomberg's use of a derogatory ethnic slur toward her (the "Title IX Complaint").

45.     On May 22, 2024, the day after filing her Title IX Complaint and with only a week left in the semester, Plaintiff's employment was terminated.  She was not even permitted to enter the grades for her students for that semester.

46.     Upon information and belief, Mr. Stomberg and/or Mr. Clodfelter initiated the false allegations against her with Employee Relations and used the subsequent findings as pretext to terminate Plaintiff and/or to persuade Mr. Stevens to terminate her employment.

47.     In August 2024, Mr. Livshits was promoted to a full-time position with benefits, over Ms. Jittapirom, the other female collaborative pianist.

## <u>COUNT I</u>

### Violation of the Delaware Wage Payment and Collection Act ("DWPCA"), 19 *Del. C.* §§ 1101, *et seq.*

48.     Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with this cause of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

13

49.    Plaintiff is an "employee" for purposes of the DWPCA.

50.    UD is an "employer" for purposes of the DWPCA.

51.    Plaintiff's promised salary of $50,000 constitutes wages under the DWPCA.

52.    As is detailed herein, UD has failed to pay Plaintiff all of her earned wages. To date, UD has not paid Plaintiff for the additional hours that she has worked and failed to honor its agreement to pay her a salary of $50,000.

53.    UD has required Plaintiff to work substantially more than 16 hours per week to complete her required duties.

54.    In the Spring 2024 semester, UD further diminished Plaintiff's capacity for earnings by reducing her hourly rate to $58 per hour (representing a 13% decrease in her hourly rate from $67 per hour).

55.    Plaintiff has demanded that she be paid for the additional hours that she has worked, without waiver of her position that she is in fact a $50,000 per year salaried employee.

56.    UD continued to refuse to pay Plaintiff for the additional work she had performed (averaging approximately 31 hours per week), and also refused to pay Plaintiff her $50,000 salary.

57.    UD has no good faith basis to avoid paying Plaintiff her earned wages.

14

58.    As a direct result of Defendants' misconduct, Plaintiff has suffered damages that are ongoing in an amount to be determined through discovery.

## COUNT II
### Breach of Contract

59.    Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with this cause of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

60.    As is detailed herein and through the exhibits attached to this Complaint, Plaintiff and Defendant formed an enforceable contract in August 2023. The two agreed Plaintiff would be paid a $50,000 salary, confirming the nature of Plaintiff's assignments and responsibilities.

61.    Plaintiff performed her end of the bargain, commencing work on or about August 29, 2023.

62.    Defendant breached the agreement on September 1, 2023 by reneging on the agreement to pay her a $50,000 salary and by refusing to pay her that salary as agreed for the rest of the academic year.

63.    Defendant further breached the parties' agreement by reducing her hourly rate (the rate used to calculate payment for extra hours beyond the 16 that she was scheduled to work) to $58 per hour (representing a 13% decrease in her hourly rate from $67 per hour).

15

64.     Defendant had no basis to breach or otherwise terminate the agreement that has been described herein.

65.     As a direct result of Defendant's misconduct, Plaintiff has suffered damages that are ongoing in an amount to be determined through discovery.

## COUNT III
**Discrimination Based on Disability**
**The Americans with Disabilities Act of 1990, as Amended ("ADA")**
**42 U.S.C. § 12101, *et seq.***

66.     Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

67.     During all relevant times, Plaintiff was an "employee" as defined in 42 U.S.C. § 12111(4).

68.     During all relevant times, Defendant was an "employer" as defined by 42 U.S.C. § 12111(5).

69.     Plaintiff was a qualified individual as defined by 42 U.S.C. § 12111(8). Defendant regarded Plaintiff as having a disability under in that it misperceived her requests to reallocate work to preserve the health of her hands as evidence of an actual, permanent substantial physical limitation of a major life activity, which Defendant treated as preventing her from performing her full scope of job duties as a collaborative pianist.

70.     Defendant discriminated against Plaintiff in violation of the ADA by taking the following adverse employment actions on the basis of her perceived disability:

    (1)   reducing her salary from $50,000 to $32,000 in August 2023;

    (2)   reducing her hourly rate of pay by 13% in the Spring 2024 semester;

    (3)   reducing her work hours to 16 hours per week but assigning her far more work than could be performed in that time period, and not paying her for the extra work; and

    (4)   terminating her employment.

71.     Plaintiff is and was at all relevant times able to perform the essential functions of the collaborative pianist role with or without an accommodation.  She sought merely to spread the workload equitably among the three collaborative pianists and in no way articulated an inability to perform the work because of the health of her hands.

72.     Plaintiff sustained substantial monetary and non-monetary damages as a result of Defendant's conduct.

### COUNT IV
### Discrimination Based on Disability
### Delaware Persons with Disabilities Employment Protections Act ("DPDEPA")
### 19 *Del. C.* § 720, *et seq.*

73.     Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

74.    During all relevant times, Plaintiff was an "employee" as defined in 19 *Del. C.* § 722(1).

75.    During all relevant times, Defendant was an "employer" as defined by 19 *Del C.* § 722(3).

76.    Plaintiff was a qualified individual as defined by 19 *Del. C.* § 722(4)(c).

77.    Plaintiff specifically incorporates the factual allegations set forth in paragraphs 69 through 72.  For those reasons, Defendant violated the DPDEPA.

<u>**COUNT V**</u>
**Retaliation in Violation of the ADA**

78.    Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

79.     Plaintiff engaged in protected activity when she consulted with the Office of Equity and Inclusion in August 2023 about filing a complaint regarding her reduction in salary and mistreatment by the department.  Plaintiff also verbally protested the unequal work balance for the sake of the health of her hands in conversations with Mr. Stomberg, which Defendants regarded as a disability accommodation request.

80.    Defendant retaliated against Plaintiff for requesting what it regarded as an accommodation for a perceived disability by breaching its agreement to pay her a salary of $50,000 and offering her, on September 1, 2023, a salary of $32,000.

81.    Plaintiff again engaged in protected activity by submitting her September 5 Complaint to Employee Relations; September 6 letter to Mr. Clodfelter; February Report to Mr. Stevens; and April Report to the Provost and Mr. Stevens (among others in upper administration).  In each of these reports, she protested the reduction in her salary and the over-assignment of work due to her perceived disability.

82.    Plaintiff continued to oppose her mistreatment by attempting to re-initiate her complaint with the Office of Equity and Inclusion on February 7 and 9, 2024.

83.    Upon information and belief, Mr. Stomberg and Mr. Stevens were aware of Plaintiff's reports because they were either made directly to them, or they were made aware of Plaintiff's reports through Employee Relations and/or Mr. Clodfelter.  Upon further information and belief, Mr. Stomberg, as Plaintiff's supervisor, and Mr. Stevens, as Interim Chair of the Department, had direct input into the decisions regarding what Plaintiff would be paid and whether to terminate Plaintiff's employment.

84.    Defendant retaliated against Plaintiff for engaging in such protected activity by:

(1)  cancelling the music class Plaintiff was teaching as an adjunct for the upcoming semester;

(2)   further reducing Plaintiff's pay rate by an additional 13% in the

Spring 2024 semester; and

(3)   terminating her employment on May 23, 2024.

85.    Defendant's retaliatory conduct described above was caused by

Plaintiff's protected activities in complaining about her mistreatment on account of

a perceived disability.

86.    Defendant's stated reasons for its treatment of Plaintiff are pretext for

its unlawful retaliation.

87.    Plaintiff sustained substantial monetary and non-monetary damages as

the result of Defendant's conduct.

### <u>COUNT VI</u>
**Retaliation**
**Delaware Persons with Disabilities Employment Protections Act,**
**19 *Del. C.* § 720, *et seq.***

88.    Plaintiff re-alleges and incorporates by reference all allegations and

paragraphs in this complaint, above and below, as though fully set forth herein.

89.    Plaintiff engaged in protected activity, and Defendant retaliated against

Plaintiff in violation of the DPDEPA because of such protected activity, as described

in paragraphs 79 through 87.

## COUNT VII
### Discrimination Based on Gender
### Title VII of the Civil Rights Act of 1964,
### 42 U.S.C. § 2000e-2, *et seq.* ("Title VII")

90.     Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

91.     During all relevant times, Plaintiff was an "employee" as defined in 42 U.S.C. § 2000e(f).

92.     During all relevant times, Defendant was an "employer" as defined by 42 U.S.C. § 2000e(b).

93.     Defendant discriminated against Plaintiff, based on her gender, when it paid her a lesser salary than her male counterpart, Mark Livshits, despite initially promising to pay them both the same $50,000 salary. Defendant only reduced Plaintiff's salary and increased her workload – Mr. Livshits' salary and duties remained unchanged.

94.     Defendant further discriminated against Plaintiff, based on her gender, when it assigned Plaintiff a higher workload relative to Mr. Livshits.

95.     Defendant further discriminated against Plaintiff, based on her gender, when it gave Mr. Livshits significantly more opportunities to work optional hours for additional pay relative to her.

96.    Defendant further discriminated against Plaintiff, based on her gender, by inequitably enforcing its rules, policies, and guidelines to the benefit of Plaintiff's male colleague and to her detriment.

97.    Defendant further discriminated against Plaintiff, based on her gender, when Mr. Livshits was given an increase of 100 hours for a concerto competition, a much larger time allotment than necessary to complete the duties and responsibilities associated with that assignment.

98.    Defendant further discriminated against Plaintiff, based on her gender, when it reduced her hourly pay rate by an additional 13% in the Spring 2024 Semester.

99.    Defendant further discriminated against Plaintiff, based on her gender, when it terminated her employment on May 23, 2024 without any legitimate reason.

100.    Defendant's stated reasons for its treatment of Plaintiff are pretext for its unlawful gender discrimination, particularly given that UD did not follow its own procedures and policies (i.e., Title IX procedures) when "investigating" and making purported findings that Plaintiff violated various policies, including UD's Title IX policies.

101.    Plaintiff sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

## COUNT VIII
### Discrimination Based on Gender
### The Delaware Discrimination in Employment Act,
### 19 *Del. C.* § 710, *et seq.* ("DDEA")

102.   Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

103.   During all relevant times, Plaintiff was an "employee" as defined in 19 *Del. C.* § 710(6).

104.   During all relevant times, Defendant was an "employer" as defined by 19 *Del. C.* § 710(7).

105.   Plaintiff specifically incorporates the factual allegations set forth in paragraphs 91 through 101 and alleges Defendant discriminated against Plaintiff on the basis of her gender, in violation of the DDEA, as set forth in these paragraphs.

## COUNT IX
### Retaliation in Violation of Title VII

106.   Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

107.   Plaintiff engaged in protected activity by opposing UD's practice of discrimination when she submitted the September 5 Complaint about her reduction in pay and notified that department that Mr. Livshits was being paid a salary of $50,000 with special consideration given to his assignments and was given an increase of 100 hours for a concerto competition, a much larger time allotment than

necessary to complete the duties and responsibilities associated with that assignment.

108.   Plaintiff continued to oppose her mistreatment by attempting to re-initiate her complaint with the Office of Equity and Inclusion on February 7 and 9, 2024.

109.   Plaintiff further engaged in protected activity when she made a report to Interim Director, Danny Stevens, in her February Report regarding Mr. Stomberg's discriminatory treatment of her and requested that Mr. Stomberg no longer be assigned as her supervisor.

110.   Plaintiff continued to oppose the discriminatory treatment she suffered in her correspondence to the upper administration in her April Report.

111.   Defendant retaliated against Plaintiff for opposing its discrimination by further reducing her pay in the Spring 2024 semester, providing her with fewer opportunities for additional hours relative to Mr. Livshits, cancelling a class Plaintiff taught for the upcoming semester, by reassigning her students to other professors, and by ultimately terminating her employment on May 23, 2024 for fabricated reasons.

112.   Defendant committed these retaliatory acts because Plaintiff engaged in protected activity alleged above.

113.    Plaintiff further engaged in protected activity on May 21, 2024 when Plaintiff reported Stomberg's derogatory ethnic slur through the University Title IX complaint form and made complaints of harassment and discrimination on the basis of national origin and religion.

114.    Defendant further retaliated against Plaintiff for opposing its discriminatory actions by notifying Plaintiff of her termination on the following day, May 22, 2024, which was effective on May 23, 2024.

115.    Upon information and belief, Mr. Stomberg and Mr. Stevens were aware of Plaintiff's reports because they were either made directly to them, or they were made aware of Plaintiff's reports through Employee Relations and/or Mr. Clodfelter.    Upon further information and belief, Mr. Stomberg, as Plaintiff's supervisor, and Mr. Stevens, as Interim Chair of the Department, had direct input into the decisions regarding Plaintiff's salary and work assignments, and whether to terminate Plaintiff's employment.

116.    Defendant's retaliatory conduct described above was caused by Plaintiff's protected activities in reporting the discriminatory conduct she was experiencing as set forth above.

117.    Plaintiff sustained substantial monetary and non-monetary damages, including loss of access to health benefits, as the result of Defendant's conduct.

## COUNT X
### Retaliation in Violation of the DDEA

118.   Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

119.   Plaintiff engaged in protected activity, and Defendant retaliated against Plaintiff in violation of the DDEA because of such protected activity, as described in paragraphs 107 through 117, which paragraphs Plaintiff specifically incorporates herein.

WHEREFORE, Plaintiff respectfully requests that the Court:

a.      Enter judgment in favor of Plaintiff and against Defendant UD on all Counts;

b.      Enter judgment awarding Plaintiff economic damages, compensatory damages, liquidated damages, and punitive damages in amount to be determined at trial;

c.      Award Plaintiff economic damages, including front and back pay;

d.      Award Plaintiff interest due on unpaid wages;

e.      Award Plaintiff liquidated damages regarding unpaid wages and wages that were untimely paid;

f.      Award Plaintiff her costs and expenses incurred in bringing and prosecuting this action, including Plaintiff's reasonable attorney's fees;

g.      Award Plaintiff pre- and post-judgment interest; and

h.     Award Plaintiff all such other relief as the Court deems just and proper.

i.     Plaintiff demands a trial by jury.


CONNOLLY GALLAGHER LLP

/s/ Lauren P. DeLuca
Lauren P. DeLuca (#6024)
Anna Brousell (#6587)
1201 N. Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300
ldeluca@connollygallagher.com
abrousell@connollygallagher.com

*Attorneys for Plaintiff*
Dated:  January 14, 2025         *Angela Draghicescu*

## <u>CERTIFICATE OF SERVICE</u>

I, Lauren P. DeLuca, hereby certify that on January 14, 2025, I caused the

foregoing to be served upon the following counsel of record via File&ServeXpress.

> James D. Taylor, Jr.
> SAUL EWING LLP
> 1201 N. Market Street, Suite 2300
> Wilmington, DE 19801
> James.taylor@saul.com

*/s/ Lauren P. DeLuca*

Lauren P. DeLuca (#6024)

EFiled:  Jan 14 2025 03:05PM EST
Transaction ID 75434606
Case No. N24C-01-070 VLM

# EXHIBIT A

 **G Suite**

Angela Draghicescu <angeladg@udel.edu>

---

**Proposal for next year's collaborative work at UD**
5 messages

---

**Lawrence Stomberg <lstom@udel.edu>**                            Fri, Jun 30, 2023 at 3:11 PM
To: Angela Draghicescu <angeladpiano@gmail.com>, Angela Draghicescu <angeladg@udel.edu>

Hi Angie,

I wanted to reach out to you about a plan for next year's work on the collaborative team at the UD School of Music. I've put together a proposal, which has been vetted and accepted, that would give you a substantial increase in your duties, with a substantial increase in pay as a result, for the 2023-24 Academic Year. I would love to speak to you in person, by phone, or on Zoom about specifics, when we are able to make that work. I'm writing this email on Friday afternoon, June 30, and could find some time to speak by phone/Zoom later this afternoon or evening, or sometime next week (I will be out of town, with spotty WiFi, but should have generally reliable cell service).

Let me know when you might be available to talk specifics (there are still moving pieces, but I can give a framework of the work and the compensation), and I'll look forward to speaking with you. I'm hoping this will come as good news, and as a show of thanks for and faith in the work you have been doing for the School of Music for the past few years.

# Thanks,
# Larry

Lawrence Stomberg
Professor of Cello
Associate Chair, Director of Performance Studies
Department of Music, University of Delaware
lstom@udel.edu

---

**Angela Draghicescu** <angeladpiano@gmail.com>
To: Lawrence Stomberg <lstom@udel.edu>
Cc: Angela Draghicescu <angeladg@udel.edu>

Fri, Jun 30, 2023 at 3:35 PM

hi Larry,

Thank you for reaching out and also thank you very much for this proposal. It does come as really good news, particularly financially as I have had to take care of my parents more and more. In fact, dad is back in the hospital again this week, and mom has surgery (minor) in a month. This year has been so rough for dad but at 84, I am blessed with him.

I am available to talk next week anytime and also best this afternoon - Elias and the kids are coming back tomorrow morning so we have the next week off.

Let me know what time later today, I will be here waiting on them.


Angie


Angela Draghicescu, D.M.A.
Phone number: 410 725 4962

---

**Lawrence Stomberg** <lstom@udel.edu>
To: Angela Draghicescu <angeladpiano@gmail.com>
Cc: Angela Draghicescu <angeladg@udel.edu>

Sat, Jul 29, 2023 at 4:54 PM

Hi Angie,

I hope all is going well for you, and if you're in this area, I hope you're all managing the heat okay!

I wanted to confirm the amount that was just approved for your salary for next year's work at UD. It will be an evcen $50,000 for the Academic Year (fall and spring semesters). This will allow you and Mark L to cover the instrumental areas (with Rebecca Wilt covering a little bit in the brass area) for degree recitals, juries, studio recitals, and the concerto competition in the fall (I will be working with that committee to advocate for the two of you and to make that process much more streamlined - stay tuned). Whatever you receive for academic classes is not part of this amount, so that income will be in addition to this.

As I am still waiting on studio numbers from about a half dozen faculty members, I am not quite yet able to share the assignments, but am working hard to make the work as fair and equitable as I can, while working with studio faculty requests.

Anyway, I wanted to share this news, and I hope it is welcome news. I know the work will be more substantial for sure, but the raise in compensation shows our belief in the team to provide excellent support for our students and faculty.

Thanks, and I look forward to seeing you sometime soon!

Larry
[illegible text]

 Lawrence Stomberg
*hun.this*
Professor of Cello
Associate Director for Performance Studies
University of Delaware School of Music
(302) 831-1214 (office)
(302) 489-8828 (cell)
lstom@udel..edu
www.lawrencestomberg.com
https://udel.zoom.us/my/lstomberg

---

**angela draghicescu** <angeladg@udel.edu>                                    Sat, Jul 29, 2023 at 5:25 PM
To: Lawrence Stomberg <lstom@udel.edu>


Dear Larry,

Thank you very much for confirming the amount and for making official this good news.

Anticipating the next steps, I would like to reiterate my previous agreement/understanding with you that for obvious reasons, I should keep the assignments already in place (for the last three years). I am gladly welcoming additional work, but would like to keep the partial flute studio, saxes, the strings, and percussion.
These are already established relationships, there is a system in place that works well for everyone, and most importantly I can tend to my hands which I have already mentioned to you are a constant consideration to not overuse when it comes to juries and repertoire familiarity.



As for juries, I would like to mention that in the situation of more assignments , the current system will not work. Playing same day juries for strings and woodwinds even spread out doesn't solve the issue . What will work, is putting them on separate days so we are actually able to play the repertoire and not exhaust our hands. The volume doesn't become an issue when it is not all at once. This year's scheme did little to alleviate  things since the type of work I did for saxophones (for example) is incomparable to strings, and therefor I played the hardest rep after having played for strings all morning
We are paid more and we should be able to commit to coming more than a few days if needed. I can talk to Mark C if needed and explain this situation since the physical "safety" of staff is top priority for employers and for him in particular, as I understand.

Thank you again for everything,

AD



Sent from my iPhone - please excuse all typos
[Quoted text hidden]

---

**angela draghicescu** <angeladg@udel.edu>                                    Sun, Aug 13, 2023 at 9:09 AM
To: Elias Goldstein <elias@eliasgoldstein.com>



Sent from my iPhone - please excuse all typos

Begin forwarded message:

# EXHIBIT B

 **G Suite**

Angela Draghicescu <angeladg@udel.edu>

## Final assignments

7 messages

**Lawrence Stomberg <lstom@udel.edu>**                                Sun, Aug 20, 2023 at 8:06 PM
To: Angela Draghicescu <angeladpiano@gmail.com>, Angela Draghicescu <angeladg@udel.edu>

Hi Angie,

Thanks for meeting yesterday, and I hope you've had a good weekend. I am on a train home from New York, but have been working on things with the studio assignments when I could, and have come up with the final list. It works out equitably between you and Mark (I will need some time to generate a new spreadsheet for you, if that spreadsheet would be helpful), and takes into account the wishes and concerns you shared, as well as the wishes of the faculty you will be supporting. Here is the list of studios with which you'll be working, in orchestral score order:

- Flute – 1/3 of the studio, per studio professor's wishes (Grycky)
- Clarinet (Nichols)
- Bassoon (Feingold)
- Saxophone (Groves)
- Horn (Smith)
- Trombone – undergraduates (Tychinski)
- Percussion (Koshinski/Broscious)
- Viola (Goldstein)

I plan on sending the email out to inform studio professors tomorrow (Monday) so we can get communication going before the start of classes. Please do not be in touch with faculty until that email is sent out, as they do not know of these assignments yet, and I want that official word coming from me. In that email, I am asking you to be in touch with the studio professors to share your expectations and needs, particularly regarding delivery of scores and communication/scheduling. I will let you take it from there with each individual faculty member.

Thanks again for your input over the past week, and I'm excited for the year ahead.

Best,
Larry

Lawrence Stomberg
Professor of Cello
Associate Chair, Director of Performance Studies
Department of Music, University of Delaware
lstom@udel.edu

**Lawrence Stomberg <lstom@udel.edu>**                                Mon, Aug 21, 2023 at 12:02 AM
To: Angela Draghicescu <angeladpiano@gmail.com>, Angela Draghicescu <angeladg@udel.edu>

Hi again, Angie,

In double checking my numbers tonight (not necessarily a great idea to finalize things while on the train), I found that you were out of balance with your numbers, at a significantly higher hours estimate than Mark, particularly in the spring semester. When I ran the numbers to move the flute studio entirely to Mark and keep you with everything else listed in the previous email, this brings things much more into balance. So, I plan on following that path for this year.

I want to make sure both that you are as fairly distributed as I can make you, and I also want to be mindful of your maintenance of injury, to make sure that you are not put into a position that could get you re-injured. I think making this change does both of these things.

Just wanted to share this in advance of sending out emails to the faculty on Monday.

Thanks,
Larry

Lawrence Stomberg
Cellist
Professor of Cello
Associate Director for Performance Studies
University of Delaware School of Music
(302) 831-1214 (office)
(302) 831-9905 (cell)
lstom@udel.edu
www.lawrencestomberg.com
https://udel.zoom.us/my/lstomberg

---

**angela draghicescu** <angeladg@udel.edu>                    Mon, Aug 21, 2023 at 7:48 AM
To: Lawrence Stomberg <lstom@udel.edu>

Hi Larry,

Would it be possible to get the numbers on the sheet (or in this email) for the new swaps? I believe I need clarinet only

AD

Sent from my iPhone - please excuse all typos

> On Aug 21, 2023, at 12:02 AM, Lawrence Stomberg <lstom@udel.edu> wrote:

---

**Lawrence Stomberg** <lstom@udel.edu>                    Mon, Aug 21, 2023 at 7:57 AM
To: angela draghicescu <angeladg@udel.edu>

Hi Angie,

Yes, of course. I will try to get that to you today.

Thanks,
Larry

Lawrence Stomberg
(he/him/his)
Cellist
Professor of Cello
Associate Director of Performance Studies
University of Delaware
www.lawrencestomberg.com

> On Aug 21, 2023, at 7:48 AM, angela draghicescu <angeladg@udel.edu> wrote:

> Hi Larry,

**Lawrence Stomberg <lstom@udel.edu>**                          Mon, Aug 21, 2023 at 10:28 AM
To: angela draghicescu <angeladg@udel.edu>

Hi Angie,

I have updated and organized the spreadsheet that has all your assignments, with a breakdown of the minimum hours guidelines below the studio numbers. It now reflects the most recent assignment I shared last night. You'll see that the Fall is quite light for you, which allows you to focus more on students' specific needs, especially regarding difficult repertoire (you'll notice that very little "credit" is given for percussion, for example, so if they throw a big project at you, there should be ample time to tackle it without overloading), and will also allow you to focus on recovering from injury.

**In case you need it, here is the link to see the updated assignments.**

Thanks,
Larry
[Quoted text hidden]

**Angela Draghicescu <angeladg@udel.edu>**                     Thu, Aug 24, 2023 at 6:13 PM
To: "Stomberg, Lawrence" <lstom@udel.edu>

Larry,

Thank you.

Just to follow up on what I mentioned in our meeting.  I will be providing rehearsals for the CC (concerto comp) and any additional needs which the scheme doesn't take into account specifically, but implied (the studio classes). The big studios (with many students comparable to others) have them now regularly and I have already committed to them. I glad to work as much as possible under manageable conditions.

AD

> On Aug 21, 2023, at 10:28 AM, Lawrence Stomberg <lstom@udel.edu> wrote:

[Quoted text hidden]

# EXHIBIT C

 **G Suite**

Angela Draghicescu <angeladg@udel.edu>

---

## Assignment in the Voice Area – Voice Rep Classes

**Angela Draghicescu** <angeladg@udel.edu>                                      Wed, Aug 30, 2023 at 5:07 PM
To: "Stomberg, Lawrence" <lstom@udel.edu>
Cc: D Smith <smithdb@udel.edu>
Bcc: elias goldstein <elias@eliasgoldstein.com>

Dear Larry,

Thank you for your emails.

I'm glad to be able to help with the existing load and would be able to offer Blake the following studio times: Wednesday September 6th, and October 11 and 16th.

Here is a brief explanation of my limitations in offering additional dates.

1.    The new offer for additional work at UD was to cover the entire instrumental area, split equally between Mark L and me. It was substantiated by the fact that Sira "was going to cover the whole vocal area". The possibility for vocal assignments was not in question because all assignments had been alized when we came to a (final) agreement of coverage within the instrumental area during our collab meeting (before the faculty retreat); this was subsequently communicated to the instrumental faculty.

Upon receiving your final approval, I went ahead and made professional arrangements both for UD and outside. I have conflicting engagements outside of the school during the requested Monday and Wednesday times in the early part of the semester as well as already discussed medical procedures to attend. After October 30th I'm not comfortable increasing my workload because of work related injury concerns. If you would like a very detailed description of the concerns and how that interferes with this assignment, I would welcome a meeting.

Please know that I don't shy from working as much as possible, in a manageable and healthy way. It is only a matter of pacing and balancing the load so that I can support the students to the best of my abilities. "Not all hours are created equal when it comes to piano playing", as you eloquently put it. So far, all my requests of balancing have not interfered with the regular work of individual studios, including my request for consideration for a certain number of juries per day. I am sure that everyone in this discussion can relate to a heightened self-preservation instinct of not ruining their livelihood.

2.    I will be more than happy to submit an accurate detailed description of the hours shortly; at the moment I do not have the complete information from faculty and students, and some have requested for me to wait until after their first lesson. I will have the complete picture by the end of the first or second week of classes as things are shifting continuously.

ake - I copied you on this email because I am very eager to help the voice area to the best of my abilities. *Particularly for any student with financial troubles – I would do it for free if I could.* For the sake of transparency, I wanted you to know my limitations and also that the hours already committed to other faculty members and students, might be taken back and given to the voice department; I think this

could potentially create more conflict and I personally would like to avoid being at the center of it if possible.

I appreciate everyone's attention to this matter and wish you a great rest of the week. Please let me know if those dates work.

Angie

# EXHIBIT D

 **G Suite**

Angela Draghicescu <angeladg@udel.edu>

---

## Collaborative Piano Arrangement for AY 23-24

**Mark Clodfelter** <markc@udel.edu>                                    Fri, Sep 1, 2023 at 9:36 AM
To: Angela Draghicescu <angeladg@udel.edu>
Cc: "Stomberg, Lawrence" <lstom@udel.edu>, Tamara Smith <tll@udel.edu>

Hi Angie,

Thanks for your recent communications about your duties, load, and expectations. We value your contribution to the team, and care for your wellness. Larry, Tamara and I have met and worked extensively to develop a model that will accommodate your needs and those of the School of Music. To balance protecting your hands, health, and well-being, while being able to attend to the varied needs of the students in the School of Music who are served by our Collaborative Piano offering, we are offering you the following:

   1. Salary will continue as last year. ($32,000/for the 23-24 academic year) for the expectation of an average of 16 hours per week in service to the Collaborative program)

   2. Additional, optional hours may be offered by the Associate Director of Performance Studies. *(at the discretion of the Director of the School of Music)*

   3. For the sake of accuracy, yet flexibility, if additional hours are offered, we will utilize a timesheet reporting system for you. This provides an accurate record of what you are able to do to serve the needs of students and studios that need coverage. Tamara will communicate the details of this reporting system.

This will allow us to plan for proper coverage for the students and for you to continue as part of the team while closely monitoring physical impact, not introducing a sudden increase in workload. If additional hours are offered on a per need basis, you will be able to make an informed decision that takes the whole picture into account.
We are thankful for your continued service to the School of Music and want to make sure that both you and our students and faculty are cared for as fully as possible.

We look forward to your participation.
Please respond to this email via reply all to indicate that you have received and understand this arrangement so that Tamara can process a contract.
Should you choose to decline this offer, kindly let us know asap as the semester has begun and we will need to have these needs covered.

Sincerely,

Mark

--
*While I may send an e-mail outside traditional working hours, I do not expect a response outside of your own.*

**Mark Clodfelter**

*Director, School of Music*
*The University of Delaware*

# EXHIBIT E

# MCALLISTER FIRM LLC

Daniel F. McAllister
dan@mcallisterfirm.com
(o) 302-543-5158
(c) 302-598-1123

800 N. King St.
Suite 203
Wilmington, DE 19801
302-543-5158

September 6, 2023

**VIA ELECTRONIC MAIL**
marke@udel.edu

Mark Clodfelter
Director, School of Music
University of Delaware

RE:    **Dr. Angela Draghicescu**

Dear Mr. Clodfelter,

I represent Angela Draghicescu with respect to her employment with the University of Delaware School of Music. Please forward this correspondence to the University's general counsel's office and to the Human Resources Department.

I write in response to your September 1, 2023 email offer to Dr. Draghicescu, proposing to reduce her hours and pay, and reverting to the use of time records for payment. This offer is rejected. Dr. Draghicescu will continue working at the School of Music for the 2023-24 academic year under the terms agreed to earlier in the summer, a salaried rate of $50,000.

Moreover, your proposed reduction in pay in response to Dr. Draghicescu request for reasonable accommodation to protect the health and safety of her hands is clear and straightforward retaliation for this reasonable and legally protected request. Dr. Draghicescu has never stated that she cannot play, or that her working hours must be reduced. Rather, she has requested the School of Music reasonably schedule recitals, juries, and other performance events in a way that is consistent with peer institutions and that does not result in acute overuse injuries, particularly at the ends of the semesters. Dr. Draghicescu has also requested that the work be distributed equitably among the other staff pianists of the Music School.

Please confirm receipt of this letter; that the School of Music will accommodate Dr. Draghicescu's entirely reasonable physical limitations by not overscheduling performances at the end of the semester; that there will be no further retaliation against Dr. Draghicescu; that her

Mark Clodfelter
Sept. 6, 2023
Page 2

performance work not be overscheduled at the ends of the semester; and that her employment at the School of Music continues under the same terms agreed to this summer, with no modification to the existing arrangement without consultation.

   If you have any questions, or if the University's attorneys wish to discuss any of the issues raised in this letter, please do not hesitate to contact me.

   Thank you.


         Very truly yours,

         /s/ Daniel F. McAllister

         Daniel F. McAllister

cc:  Angela Draghicescu

# EXHIBIT F

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Philadelphia District Office**
801 Market St, Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website:  www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 10/03/2024

**To:** Ms. Angela Draghicescu
342 Egypt Run Rd.
Landenberg, PA 19350

Charge No: 530-2024-09615
EEOC Representative and phone:    Legal
Legal Unit
(267) 589-9707

---

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 530-2024-09615.

On behalf of the Commission,

Digitally Signed By: Karen McDonough
10/03/2024
Karen McDonough
Deputy District Director

**Cc:**
Angela Downin
University of Delaware
162 The Green, Rm 112
Newark, DE 19716

Incident Location
University of Delaware
210 S. College Ave.
Newark, DE 19716

Lauren DeLuca Esq.
Connolly Gallagher LLP
1201 N. Market St., 20th Fl
Wilmington, DE 19801


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 530-2024-09615 to the

District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 530-2024-09615 to the District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# EXHIBIT G

**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS – OFFICE OF ANTI-DISCRIMINATION**

---

Ms. Angela Draghicescu                         Charge No: 530-2024-09615 / DRA100324
342 Egypt Run Rd.
Landenberg, PA 19350
v.

University of Delaware
210 S. College Ave.
Newark, DE 19716

---

**FINAL DETERMINATION AND RIGHT TO SUE NOTICE**

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

**Administrative Dismissal with Corresponding Right to Sue Notice.**

In this case, the EEOC has granted Charging Party's request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed. The EEOC terminated its processing of this charge, and as such, the Department has determined no further benefit which can be provided to the parties under the administrative process and issues this Administrative Dismissal to signal the end of the administrative process without a specific finding. This Administrative Dismissal also provides the Charging Party with a Delaware Right to Sue Notice.

This administrative dismissal is based upon 19 Del. C. § 712 (c) (5) which states: "End of Administrative Process. In all cases where the Department has dismissed the Charge, issued a No Cause Determination or upon the parties failed conciliation efforts, the Department shall issue a Delaware Right to Sue Notice, acknowledging the Department's termination of the administrative process. Once the Department has issued its preliminary findings pursuant to subsection (2), the Department, in its discretion, may grant a Delaware Right to Sue Notice to a Charging Party."

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Office of Anti-Discrimination.

*Jason K. Atallian*

---
Jason K. Atallian, Administrator
Division of Industrial Affairs, Office of Anti-Discrimination

October 18, 2024

**Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802**

17C CP Administrative Dismissal 20240301.doc

### NOTICE OF DELAWARE RIGHTS

*The Department of Office of Anti-Discrimination provides the following excerpt from 19 Del. C. § 710, et seq. as information regarding the Delaware Right to Sue Notice. If you need legal advice, please seek your own legal counsel.*

**§ 714. Civil action by the Charging Party; Delaware Right to Sue Notice; election of remedies.**

(a)    A Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same.

(b)    The Delaware Right to Sue Notice shall include authorization for the Charging Party to bring a civil action under this Chapter in Superior Court by instituting suit within ninety (90) days of its receipt or within ninety (90) days of receipt of a Federal Right to Sue Notice, whichever is later.

(c)    The Charging Party shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A Charging Party is barred by this election of remedies from filing cases in both Superior Court and the federal forum. If the Charging Party files in Superior Court and in a federal forum, the Respondent may file an application to dismiss the Superior Court action under this election of remedies provision.

### NOTICE OF FEDERAL RIGHTS

1.    If your case was also filed under federal law and resulted in a "No Cause" finding, you have additional appeal rights with the Equal Employment Opportunity Commission. Under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the DDOL's final finding. To obtain this review, you must request it by writing to EEOC within **15 days of your receipt** of DDOL's final finding in your case. Otherwise, EEOC will generally adopt the DDOL's findings.

2.    If your case was also filed under federal law, you have the right to request a federal Right to Sue Notice from the EEOC. To obtain such a federal Right to Sue Notice, you must make a written request directly to EEOC at the address shown below. Upon its receipt, EEOC will issue you a Notice of Right to Sue and you will have ninety (90) days to file suit. The issuance of a Notice of Right to Sue will normally result in EEOC terminating all further processing.

3.    Requests may be addressed to: PHLSTATEANDLOCAL@eeoc.gov or mailed to:

Equal Employment Opportunity Commission
801 Market Street
Penthouse, Suite 1300
Philadelphia, PA 19107

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*