# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ANGELA DRAGHICESCU,    )
)
)
    Plaintiff,    )    C.A. No.:  25-107-RGA
)
  v.    )
)
)
UNIVERSITY OF DELAWARE,    )

    Defendant.

## SECOND AMENDED COMPLAINT

Plaintiff Angela Draghicescu ("Plaintiff"), by and through her undersigned

counsel, based upon personal knowledge and upon information and belief as to all

other matters, alleges as follows:

## PARTIES

1.    Plaintiff is an adult individual and resident of Pennsylvania who may

be contacted through her undersigned counsel.

2.    Defendant University of Delaware ("Defendant") is a public university

organized in and pursuant to the laws of the State of Delaware.

## FACTS

3.    Plaintiff commenced employment with Defendant in the Spring 2020,

working within Defendant's School of Music.

4.      At all relevant times, Plaintiff was a W-2 employee of Defendant.

5.      In 2023, Plaintiff was one of three collaborative pianists with the School of Music, working alongside Mark Livshits, and Sira Jittapirom.

6.      On June 30, 2023, Lawrence Stomberg, then-Associate Chair of Performance Studies (part of the School of Music administration), offered Plaintiff an increased salary of $50,000 with a corresponding increase in workload, as is evidenced in the email thread attached hereto as **Exhibit A**.

7.      On July 29, 2023, Mr. Stomberg wrote to Plaintiff, confirming that her increase in salary to an even $50,000 for the entire academic year was approved. *See* **Exhibit A**.  Mr. Stomberg additionally indicated he was waiting on data to ensure workload was equitably distributed among School of Music faculty. *See* **Exhibit A**.

8.      Plaintiff responded to Mr. Stomberg on July 29, 2023, thanking him, and specifically mentioning the scheduling and frequency of juries. Plaintiff was concerned with the health of her hands (she is and was a pianist at all relevant times), as well as the hands of her colleagues, through "over playing" instruments during a condensed period of time. *See* **Exhibit A**. Plaintiff was not indicating she could not handle the workload contemplated for her $50,000-salaried position.

9.      In or around August 2023 when Plaintiff attempted to ask Mr. Stromberg a question about transparency within the Department, he told her to "stop

2

being confrontational." This was following an earlier encounter with Mr. Stromberg in which he called Plaintiff "hormonal."

10.    On August 10, 2023, Plaintiff requested a "Title 9 meeting" with the Office of Equity and Inclusion to discuss her situation. On August 11, 2023, Plaintiff met with Tiffany Chen concerning Mr. Stomberg's treatment of her. Plaintiff also shared with Ms. Chen the comments Mr. Stomberg had made to her about being "confrontational" and "hormonal."

11.    On or about August 15, 2023, Plaintiff met with Susanne Laliberte of Employee Relations concerning the same issues. Later that day, Plaintiff asked to hold off on filing a complaint with Employee Relations because she had learned "new information related to [her] supervisor," and wanted to sort it out first. Plaintiff had hoped she could reach a resolution internally, without moving forward with a formal complaint.

12.    Plaintiff and Mr. Stomberg met on or about August 19, 2023 to continue discussing the distribution of work for the School of Music. An email thread beginning August 20, 2023 contextualizes their discussions, which is attached hereto as **Exhibit B**. As can be seen therein, Mr. Stomberg purports to accommodate Plaintiff's needs regarding the health of her hands. Mr. Stomberg also purports to have made assignments for the instrumental area duties to be equally split between Plaintiff and Mr. Livshits, but in a meeting in which these assignments were

3

discussed, only one studio was swapped and the issue of the imbalance in workload toward the end of the semester was not remedied.

13.    After assignments were finalized, on August 28, 2023 – the day before the start of the Fall semester – Mr. Stomberg attempted to add vocal classes to Plaintiff's workload. Plaintiff did not refuse this addition to her assignments but raised concerns with the increase in workload on the potential for injury and the fact that she had scheduling conflicts.

14.    Their conversation continued through the end of August 2023.  Plaintiff and Defendant came to an enforceable agreement regarding Plaintiff's pay, assignments, and responsibilities through the correspondence and communications described herein.  Classes for the Fall 2023 semester commenced on August 29, 2023. Plaintiff began work on or about that day (in addition to substantial preparation she had undergone before that date).

15.    On August 30, 2023, Plaintiff emailed Mr. Stomberg again regarding scheduling and the distribution of work, a copy of which is attached hereto as **Exhibit C**. She explicitly referenced pacing and balancing her workload in order to protect the health of her hands. Plaintiff was concerned that Mr. Stomberg was mandating that she work even more than what was agreed upon in the preceding weeks (*i.e.*, asking Plaintiff to assist with additional assignments for the vocal studio).

4

16.    On September 1, 2023, Mark Clodfelter, the then-Director of the School of Music, after consultation with Stomberg, abruptly breached UD's agreement to pay Plaintiff a $50,000 salary through an email, attached hereto as **Exhibit D**.

17.    Mr. Clodfelter informed Plaintiff that her salary would be reduced to $32,000 for the 2023-2024 academic year with the opportunity to work additional hours to be paid hourly, *if offered*, which she would be required to report on a timesheet reporting system. He reduced her hours to an average of 16 hours per week, despite her assignments remaining the same, making it impossible to complete all her assigned work in 16 hours per week. Mr. Clodfelder explicitly mentioned he made this decision to purportedly "protect[] [Plaintiff's] hands, health, and well-being." **Exhibit D**. Thus, Plaintiff was penalized for requesting reasonable accommodations for her health and safety, which Defendant interpreted and regarded as a disability.

18.    Throughout the duration of the 2023-2024 academic year, Defendant required Plaintiff to work significantly more than 16 hours per week. On average, Plaintiff worked approximately 31 hours per week, not including the 5.14 hours per week required by the music course that she taught in both the spring and fall semesters (course MUSC 241).

19.    Over the next several months, Plaintiff protested Mr. Clodfelter's

reneging through various channels.

20.    On or about September 5, 2023, Plaintiff submitted a Complaint form to Employee Relations (the "September 5 Complaint"), complaining about, among other things: her reduction in pay while simultaneously being asked to perform the same workload under a reduced hours schedule; the fact that she had voiced concerns for injury prevention and was met with a pay reduction instead; and the fact that she was assigned a disproportionate amount of hours relative to duties, as compared to Mr. Livshits.

21.    On September 6, 2023, Plaintiff further protested Mr. Clodfelter's breach of contract by sending a letter to Mr. Clodfelter through her former counsel, which is attached hereto as **Exhibit E**. In this letter, Plaintiff rejected Mr. Clodfelter's reneging of UD's promise to pay her a $50,000 and opposed the retaliatory treatment Plaintiff received on account of her request for a reasonable accommodation.

22.    Plaintiff's September 5 Complaint to Employee Relations about her concerns was met with delay and hostility. On September 11, 2023, Ms. Laliberte cancelled a scheduled meeting between her and Plaintiff to discuss her Complaint on the grounds that Plaintiff had "filed an additional complaint." Plaintiff responded that she was not aware of filing another complaint and asked for the meeting to go forward as scheduled. Ms. Laliberte responded that she was sorry she could not

offer any further details, but that she was directed to wait on Plaintiff's complaint until the "other matter" had been resolved.

23.    Ms. Laliberte did not contact Plaintiff again until over a month later, on October 25, 2023. In that meeting, Ms. Laliberte aggressively accused Plaintiff of not being an adjunct faculty member and told Plaintiff that she should have reached out to their department for disability accommodations. Ms. Laliberte followed this conversation up with information and links for requesting a reasonable accommodation. Clearly, Defendant viewed Plaintiff as disabled and potentially in need of accommodations, when all Plaintiff was trying to do was to rectify the unbalanced workload for the sake of injury prevention.

24.    Employee Relations eventually performed an incomplete investigation into Plaintiff's September 5 Complaint. Completely ignoring Plaintiff's concerns about her differential treatment as compared to her male colleague, Mark Livshits (among other "DEI concerns"), on November 3, 2023, Employee Relations issued a "Closeout Discussion" memorandum that found "no evidence" to substantiate the claim relating to an employment of immediate family members policy violation claim. It made no finding as to Plaintiff's "DEI concerns," or complaint about discrimination and differential treatment as compared to her male colleague.

25.    Following this, Plaintiff retained counsel to attempt to sort out her wage dispute with the University. Employee Relations and the University's in-

house counsel instead informed Plaintiff that she was an hourly employee, to be paid for the hours she worked. When Plaintiff and the University were unable to come to an agreement on the amount of wages owed to her, Plaintiff's counsel informed the University that she intended to proceed with her wage claim and that she reserved all rights regarding her discrimination claim.

26.     On January 10, 2024, Plaintiff initiated this action in this Court for violation of the Delaware Wage Payment and Collection Act, and for breach of contract. Plaintiff continued to work for Defendant in the meantime, but her working conditions and environment worsened.

27.     Despite Plaintiff's repeated efforts to advocate and protect herself, the Defendant continued to engage in a course of conduct of discrimination and retaliation based on her perceived disability and because she voiced concerns about injuring her hands as a result of UD's unreasonable workload demands and her Mr. Stomberg's discriminatory treatment of her as compared to her male colleague, Mr. Livshits.

28.     Throughout the 2023-2024 academic year, Mr. Stomberg treated Mr. Livshits more favorably relative to Plaintiff with respect to workload distribution, opportunities for extras pay, and in promotional opportunities.

29.     For example, in the 2023-2024 school year, Mr. Livshits was paid $50,000—the compensation Claimant was also promised until UD breached its

8

agreement and reduced her salary to $32,000. The University did not reduce Mr. Livshits's salary; yet the distribution of assignments between Plaintiff and Mr. Livshits remained the same, and Plaintiff was actually assigned more work than Mr. Livshits. In essence, the University required Plaintiff to not only perform more work than her male colleague, but also to accept lower pay than him.

30.    As further examples, at the beginning of the Fall 2023 semester, Mr. Livshits was given 100 hours for a concerto competition, which is significantly more hours than necessary to complete the duties and responsibilities associated with that assignment. Subsequently, Mr. Stomberg reversed coverage of these duties. Mr. Stomberg removed the preliminary round of this competition from Mr. Livshits' responsibilities so that he was responsible for covering the final round only, which effectively reduced this assignment by at least 75 hours.

31.    Mr. Livshits had a history of being afforded great leniency by Mr. Stomberg, who did not discipline him for failing to timely appear (or appear at all) for mandatory assignments of collaborative pianists, such as rehearsals, the concerto competition, juries, and recitals.

32.    On February 7, 2024, Plaintiff reached out to Ms. Chen with the Office of Equity and Inclusion, asking to set up a meeting to discuss and move forward with the issue she had previously raised in the Fall 2023 semester. Plaintiff followed up with Ms. Chen on February 9, 2024 but received no response.

33.     On February 11, 2024, Plaintiff met with Daniel Stevens ("Mr. Stevens"), the current interim director for the School of Music regarding Stomberg's discriminatory treatment of her in comparison with Mr. Livshits and asked that Mr. Stomberg no longer be assigned as her supervisor (the "February Report").

34.     Following this meeting, on March 12, 2024—in the middle of the Spring semester, Mr. Stevens abruptly informed Plaintiff that the MUSC 241 course that she taught as an adjunct professor would not be offered for the following academic year, ostensibly due to "budget reasons," thus depriving her of income she stood to make for teaching the MUSC 241 course in the coming semester.

35.     In addition to canceling Plaintiff's class, the University committed further acts of discrimination and retaliation by reassigning some of Plaintiff's students to other professors, which curtailed the ability for her to earn extra hours for compensation.

36.     In addition, in the Spring 2024 Semester, Plaintiff discovered that the hourly rate used to calculate her compensation was reduced from $67 per hour to $58 per hour, representing an approximate 13% reduction in her pay rate.

37.     On April 16, 2024, Plaintiff contacted upper administration (including the Provost's office and Mr. Stevens) to report that she was experiencing continued retaliation from Mr. Stomberg and requested that he be removed as her supervisor

(the "April Report"). She further reported, among other things, that Mr. Stomberg had cut her pay on the basis of a perceived disability, and that he was attempting to force her to resign by assigning her work that was not paid following her September 5 Complaint. Plaintiff also reported the 13% decrease to her pay rate that semester, unilateral changes made to her contract by UD's Employee Relations department, and the removal of the music course following her filing of the wage payment lawsuit against the University. Finally, Plaintiff complained about an "extensive pattern of discrimination."

38.    On or around April 23, 2024, as Plaintiff was walking across campus, she crossed paths with Mr. Stomberg. Plaintiff asked him how he was, and he became very uncomfortable, turned red, and said "how do you think I am doing you disgusting kike." Plaintiff, a Jewish person, was shocked by his use of this derogatory ethnic slur toward her.

39.    Not long after this, on May 8, 2024, Plaintiff received an email from Employee Relations asking to schedule a meeting with her to discuss "some student concerns that were brought to [their] attention." Perplexed, Plaintiff agreed. If these were genuine concerns brought by students, Plaintiff understood that there was a grievance process in the handbook was available for them to bring such concerns. But, because Employee Relations was requesting this interview, Plaintiff grew concerned that the "concerns" had originated with one of her colleagues (for

example, Mr. Stomberg) and was yet another measure of intended retaliation for her voicing her concerns about her mistreatment.

40.    On May 17, 2024, Plaintiff received a Close Out Memorandum from Employee Relations finding that she had allegedly acted "inappropriately and unprofessionally" in interactions with students and that she had supposedly violated "UD's Code of Ethics, The Faculty Handbook; Non-Discrimination, Sexual Misconduct and Title IX." These serious, unsupported allegations were determined by UD's Employee Relations department and were not investigated according to the proper processes and channels as afforded, for example, under UD's Title IX policies and procedures at the very least. Plaintiff was not given adequate notice of the allegations made against her, nor was she afforded any opportunity to be heard and to defend against those allegations. In direct violation of Title IX procedures, Plaintiff was never afforded a hearing related to the Title IX allegations of sexual misconduct.

41.    On May 21, 2024, Plaintiff made a Title IX Complaint, reporting Mr. Stomberg's use of a derogatory ethnic slur toward her (the "Title IX Complaint").

42.    On May 22, 2024, the day after filing her Title IX Complaint and with only a week left in the semester, Plaintiff's employment was terminated. She was not even permitted to enter the grades for her students for that semester.

43.    Upon information and belief, Mr. Stomberg and/or Mr. Clodfelter

initiated the false allegations against her with Employee Relations and used the subsequent findings as pretext to terminate Plaintiff and/or to persuade Mr. Stevens to terminate her employment.

44.     In August 2024, Mr. Livshits was promoted to a full-time position with benefits, over Ms. Jittapirom, the other female collaborative pianist.

45.     On October 18, 2024, the Delaware Department of Labor issued a Right to Sue notice to Plaintiff.  **Exhibit F.**

## COUNT I

### Violation of the Delaware Wage Payment and Collection Act ("DWPCA"), 19 *Del. C.* §§ 1101, *et seq.*

46.     Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with this cause of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

47.     Plaintiff is an "employee" for purposes of the DWPCA.

48.     UD is an "employer" for purposes of the DWPCA.

49.     Plaintiff's promised salary of $50,000 constitutes wages under the DWPCA.

50.     As is detailed herein, UD has failed to pay Plaintiff all of her earned wages. To date, UD has not paid Plaintiff for the additional hours that she has worked and failed to honor its agreement to pay her a salary of $50,000.

51.    UD has required Plaintiff to work substantially more than 16 hours per week to complete her required duties.

52.    In the Spring 2024 semester, UD further diminished Plaintiff's capacity for earnings by reducing her hourly rate to $58 per hour (representing a 13% decrease in her hourly rate from $67 per hour).

53.    Plaintiff has demanded that she be paid for the additional hours that she has worked, without waiver of her position that she is in fact a $50,000 per year salaried employee.

54.    UD continued to refuse to pay Plaintiff for the additional work she had performed (averaging approximately 31 hours per week), and also refused to pay Plaintiff her $50,000 salary.

55.    UD has no good faith basis to avoid paying Plaintiff her earned wages.

56.    As a direct result of Defendants' misconduct, Plaintiff has suffered damages that are ongoing in an amount to be determined through discovery.

## COUNT II
### Breach of Contract

57.    Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint (except those that are inconsistent with this cause of action, including but not limited pleadings in the alternative), above and below, as though fully set forth herein.

58.    As is detailed herein and through the exhibits attached to this

Complaint, Plaintiff and Defendant formed an enforceable contract in August 2023. The two agreed Plaintiff would be paid a $50,000 salary, confirming the nature of Plaintiff's assignments and responsibilities.

59.    Plaintiff performed her end of the bargain, commencing work on or about August 29, 2023.

60.    Defendant breached the agreement on September 1, 2023 by reneging on the agreement to pay her a $50,000 salary and by refusing to pay her that salary as agreed for the rest of the academic year.

61.    Defendant further breached the parties' agreement by reducing her hourly rate (the rate used to calculate payment for extra hours beyond the 16 that she was scheduled to work) to $58 per hour (representing a 13% decrease in her hourly rate from $67 per hour).

62.    Defendant had no basis to breach or otherwise terminate the agreement that has been described herein.

63.    As a direct result of Defendant's misconduct, Plaintiff has suffered damages that are ongoing in an amount to be determined through discovery.

## COUNT III
### Discrimination Based on Disability
### Delaware Persons with Disabilities Employment Protections Act ("DPDEPA")
### 19 *Del. C.* § 720, *et seq.*

64.    Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

65.     During all relevant times, Plaintiff was an "employee" as defined 19 *Del. C.* § 722(1).

66.     During all relevant times, Defendant was an "employer" as defined by 19 *Del C.* § 722(3).

67.     Plaintiff was a qualified individual as defined by 19 *Del. C.* § 722(4)(c).  Defendant regarded Plaintiff as having a disability under in that it misperceived her requests to reallocate work to preserve the health of her hands as evidence of an actual, permanent substantial physical limitation of a major life activity, which Defendant treated as preventing her from performing her full scope of job duties as a collaborative pianist.

68.     Defendant discriminated against Plaintiff in violation of the DPDEPA by taking the following adverse employment actions on the basis of her perceived disability:

    (1)   reducing her salary from $50,000 to $32,000 in August 2023;

    (2)   reducing her hourly rate of pay by 13% in the Spring 2024 semester;

    (3)   reducing her work hours to 16 hours per week but assigning her far more work than could be performed in that time period, and not paying her for the extra work; and

    (4)   terminating her employment.

69.     Plaintiff is and was at all relevant times able to perform the essential

functions of the collaborative pianist role with or without an accommodation.  She sought merely to spread the workload equitably among the three collaborative pianists and in no way articulated an inability to perform the work because of the health of her hands.

70.    Plaintiff sustained substantial monetary and non-monetary damages as a result of Defendant's conduct.

## COUNT IV
### Retaliation in Violation of the DPDEPA, 19 *Del. C.* § 720, *et seq.*

71.    Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

72.    Plaintiff engaged in protected activity when she consulted with the Office of Equity and Inclusion in August 2023 about filing a complaint regarding her reduction in salary and mistreatment by the department.  Plaintiff also verbally protested the unequal work balance for the sake of the health of her hands in conversations with Mr. Stomberg, which Defendants regarded as a disability accommodation request.

73.    Defendant retaliated against Plaintiff for requesting what it regarded as an accommodation for a perceived disability by breaching its agreement to pay her a salary of $50,000 and offering her, on September 1, 2023, a salary of $32,000.

74.    Plaintiff again engaged in protected activity by submitting her September 5 Complaint to Employee Relations; September 6 letter to Mr.

Clodfelter; February Report to Mr. Stevens; and April Report to the Provost and Mr. Stevens (among others in upper administration). In each of these reports, she protested the reduction in her salary and the over-assignment of work due to her perceived disability.

75.    Plaintiff continued to oppose her mistreatment by attempting to re-initiate her complaint with the Office of Equity and Inclusion on February 7 and 9, 2024.

76.    Upon information and belief, Mr. Stomberg and Mr. Stevens were aware of Plaintiff's reports because they were either made directly to them, or they were made aware of Plaintiff's reports through Employee Relations and/or Mr. Clodfelter. Upon further information and belief, Mr. Stomberg, as Plaintiff's supervisor, and Mr. Stevens, as Interim Chair of the Department, had direct input into the decisions regarding what Plaintiff would be paid and whether to terminate Plaintiff's employment.

77.    Defendant retaliated against Plaintiff for engaging in such protected activity by:

> (1)  cancelling the music class Plaintiff was teaching as an adjunct for the upcoming semester;

> (2)  further reducing Plaintiff's pay rate by an additional 13% in the Spring 2024 semester; and

18

(3)   terminating her employment on May 23, 2024.

78.    Defendant's retaliatory conduct described above was caused by Plaintiff's protected activities in complaining about her mistreatment on account of a perceived disability.

79.    Defendant's stated reasons for its treatment of Plaintiff are pretext for its unlawful retaliation.

80.    Plaintiff sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

**COUNT V**
**Discrimination Based on Gender**
**The Delaware Discrimination in Employment Act,**
**19 *Del. C.* § 710, *et seq.* ("DDEA")**

81.    Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

82.    During all relevant times, Plaintiff was an "employee" as defined in 19 *Del. C.* § 710(6).

83.    During all relevant times, Defendant was an "employer" as defined by 19 *Del. C.* § 710(7).

84.    Defendant discriminated against Plaintiff, based on her gender, when it paid her a lesser salary than her male counterpart, Mark Livshits, despite initially promising to pay them both the same $50,000 salary. Defendant only reduced Plaintiff's salary and increased her workload – Mr. Livshits' salary and duties

19

remained unchanged.

85.    Defendant further discriminated against Plaintiff, based on her gender, when it assigned Plaintiff a higher workload relative to Mr. Livshits.

86.    Defendant further discriminated against Plaintiff, based on her gender, when it gave Mr. Livshits significantly more opportunities to work optional hours for additional pay relative to her.

87.    Defendant further discriminated against Plaintiff, based on her gender, by inequitably enforcing its rules, policies, and guidelines to the benefit of Plaintiff's male colleague and to her detriment.

88.    Defendant further discriminated against Plaintiff, based on her gender, when Mr. Livshits was given an increase of 100 hours for a concerto competition, a much larger time allotment than necessary to complete the duties and responsibilities associated with that assignment.

89.    Defendant further discriminated against Plaintiff, based on her gender, when it reduced her hourly pay rate by an additional 13% in the Spring 2024 Semester.

90.    Defendant further discriminated against Plaintiff, based on her gender, when it terminated her employment on May 23, 2024 without any legitimate reason.

91.    Defendant's stated reasons for its treatment of Plaintiff are pretext for its unlawful gender discrimination, particularly given that UD did not follow its own

procedures and policies (i.e., Title IX procedures) when "investigating" and making purported findings that Plaintiff violated various policies, including UD's Title IX policies.

92.     Plaintiff sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

## COUNT VI
## Retaliation in Violation of the DDEA

93.     Plaintiff re-alleges and incorporates by reference all allegations and paragraphs in this complaint, above and below, as though fully set forth herein.

94.     Plaintiff engaged in protected activity by opposing UD's practice of discrimination when she submitted the September 5 Complaint about her reduction in pay and notified that department that Mr. Livshits was being paid a salary of $50,000 with special consideration given to his assignments and was given an increase of 100 hours for a concerto competition, a much larger time allotment than necessary to complete the duties and responsibilities associated with that assignment.

95.     Plaintiff continued to oppose her mistreatment by attempting to re-initiate her complaint with the Office of Equity and Inclusion on February 7 and 9, 2024.

96.     Plaintiff further engaged in protected activity when she made a report to Interim Director, Danny Stevens, in her February Report regarding Mr.

Stomberg's discriminatory treatment of her and requested that Mr. Stomberg no longer be assigned as her supervisor.

97.   Plaintiff continued to oppose the discriminatory treatment she suffered in her correspondence to the upper administration in her April Report.

98.   Defendant retaliated against Plaintiff for opposing its discrimination by further reducing her pay in the Spring 2024 semester, providing her with fewer opportunities for additional hours relative to Mr. Livshits, cancelling a class Plaintiff taught for the upcoming semester, by reassigning her students to other professors, and by ultimately terminating her employment on May 23, 2024 for fabricated reasons.

99.   Defendant committed these retaliatory acts because Plaintiff engaged in protected activity alleged above.

100.   Plaintiff further engaged in protected activity on May 21, 2024 when Plaintiff reported Stomberg's derogatory ethnic slur through the University Title IX complaint form and made complaints of harassment and discrimination on the basis of national origin and religion.

101.   Defendant further retaliated against Plaintiff for opposing its discriminatory actions by notifying Plaintiff of her termination on the following day, May 22, 2024, which was effective on May 23, 2024.

102.   Upon information and belief, Mr. Stomberg and Mr. Stevens were

aware of Plaintiff's reports because they were either made directly to them, or they were made aware of Plaintiff's reports through Employee Relations and/or Mr. Clodfelter.  Upon further information and belief, Mr. Stomberg, as Plaintiff's supervisor, and Mr. Stevens, as Interim Chair of the Department, had direct input into the decisions regarding Plaintiff's salary and work assignments, and whether to terminate Plaintiff's employment.

103.  Defendant's retaliatory conduct described above was caused by Plaintiff's protected activities in reporting the discriminatory conduct she was experiencing as set forth above.

104.  Plaintiff sustained substantial monetary and non-monetary damages, including loss of access to health benefits, as the result of Defendant's conduct.

   **WHEREFORE,** Plaintiff respectfully requests that the Court:

a.    Enter judgment in favor of Plaintiff and against Defendant UD on all Counts;

b.    Enter judgment awarding Plaintiff economic damages, compensatory damages, liquidated damages, and punitive damages in amount to be determined at trial;

c.    Award Plaintiff economic damages, including front and back pay;

d.    Award Plaintiff interest due on unpaid wages;

23

e.    Award Plaintiff liquidated damages regarding unpaid wages and wages that were untimely paid;

f.    Award Plaintiff her costs and expenses incurred in bringing and prosecuting this action, including Plaintiff's reasonable attorney's fees;

g.    Award Plaintiff pre- and post-judgment interest; and

h.    Award Plaintiff all such other relief as the Court deems just and proper.

i.    Plaintiff demands a trial by jury.

CONNOLLY GALLAGHER LLP

*/s/ Lauren P. DeLuca*
Lauren P. DeLuca (#6024)
Anna Brousell (#6587)
1201 N. Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300
ldeluca@connollygallagher.com
abrousell@connollygallagher.com

*Attorneys for Plaintiff*
*Angela Draghicescu*

Dated:  March 7, 2025